# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL ACTION** |
| **VERSUS** | **NO. 18-75** |
| **TERRELL MUSE** | **SECTION: "E" (1)** |

### ORDER AND REASONS

Before the Court is Defendant Terrell Muse's motion to suppress.[1] The motion is opposed.[2] The parties have filed post-hearing briefing.[3] For the reasons set forth below, the motion is **GRANTED**.

### BACKGROUND

Muse was arrested on June 13, 2017.[4] A three-count indictment, issued on April 13, 2018, charges Muse with (1) possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2); (2) possession of cocaine base, in violation of 21 U.S.C. § 844(a); and (3) possession of heroin, in violation of 21 U.S.C. § 844(a).[5]

On September 11, 2018, Muse filed the instant motion. He argues his detention was an unconstitutional arrest because the officers did not have probable cause to arrest him.[6] He also argues that, even if the stop were a *Terry* stop, the officers did not have reasonable suspicion to detain him.[7] As a result, Muse moves to suppress all evidence resulting from his arrest, including car keys seized from his person and drugs and firearms found in the

---

[1] R. Doc. 26.
[2] R. Doc. 27.
[3] R. Docs. 40, 41.
[4] R. Doc. 26-2 at 4.
[5] R. Doc. 1.
[6] R. Doc. 26-1 at 1.
[7] *Id.* at 3–7.

car to which the keys corresponded.[8] On November 1, 2018, the Court held a hearing on the motion to suppress.

## STANDARD OF LAW

The exclusionary rule forbids the use of evidence obtained in violation of the Fourth Amendment.[9] "The rule's sole purpose . . . is to deter future Fourth Amendment violations. [The Supreme Court's] cases have thus limited the rule's operation to situations in which this purpose is "thought most efficaciously served.""[10] As a general rule, the proponent of a motion to suppress must prove by a preponderance of the evidence that the evidence in question was obtained in violation of his or her Fourth Amendment rights.[11] In the case of a warrantless search or seizure, the burden shifts to the Government to prove by a preponderance of the evidence that its actions were constitutional.[12]

## LAW AND ANALYSIS

### I. Officer Nicholas Kozlowski's detention of Muse was a warrantless arrest.

On June 13, 2017, Officer Nicholas Kozlowski detained Muse.[13] The Government argues Officer Kozlowski's detention of Muse was not a warrantless arrest but instead was a *Terry* stop. Under the Supreme Court's decision in *Terry v. Ohio*, police officers may "'stop' a person and detain him briefly for questioning upon suspicion that he may be connected with criminal activity" without the stop rising to the level of an arrest.[14] In

---

[8] In his original motion, Muse moves to suppress the Taurus pistol, ammunition, and any post-seizure statements. *Id*. at 1. At the suppression hearing, counsel for Muse clarified that he moves to suppress all evidence seized. R. Doc. 36 at 97:18–98:6.

[9] *United States v. Otero*, 176 F.3d 479 (5th Cir. 1999) (per curiam). The good-faith exception to this rule allows the use of evidence "obtained as a result of nonculpable, innocent police conduct." *Davis v. United States*, 564 U.S. 229, 240 (2011). This exception is not urged in this case.

[10] *Davis*, 564 U.S. at 236–37 (citations omitted).

[11] *United States v. Iraheta*, 764 F.3d 455, 460 (5th Cir. 2014).

[12] *United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001).

[13] R. Doc. 26-2 at 4.

[14] *Terry v. Ohio*, 392 U.S. 1, 10 (1968).

contrast, warrantless arrests must be based on probable cause.[15] "Probable cause for a warrantless arrest exists when the totality of facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense."[16]

"Police detention constitutes an "arrest," such that it must be accompanied by probable cause, if a reasonable person in the suspect's position would understand the situation to be a restraint on freedom of the kind that the law typically associates with a formal arrest."[17] In determining whether a *Terry* stop rises to the level of an arrest, "the 'critical threshold issue is the intrusiveness of the seizure.' Regardless how efficient it may be for law enforcement officials to engage in prolonged questioning to investigate a crime, or how reasonable in light of law enforcement objectives it may be to detain a suspect until various inquiries can be made and answered, a seizure that in duration, scope, or means goes beyond the bounds of *Terry* cannot be reconciled with the Fourth Amendment in the absence of probable cause."[18] The Fifth Circuit has held that, to determine whether a detention exceeded the bounds of a *Terry* stop and rose to the level of an arrest, "[t]he relevant inquiry is whether the police were unreasonable in failing to use less intrusive procedures to safely conduct their investigation."[19] This inquiry is "always one of reasonableness under the circumstances."[20] Police officers are not "automatically authorized to employ procedures" like handcuffing or using force in every

---

[15] *See United States v. Wadley*, 59 F.3d 510, 512 (5th Cir. 1995).
[16] *Id.*
[17] *Freeman v. Gore*, 483 F.3d 404, 413 (5th Cir. 2007) (citing *United States v. Corral–Franco*, 848 F.2d 536, 540–41 (5th Cir.1988); *United States v. Bengivenga*, 845 F.2d 593, 596–97 (5th Cir.1988) (en banc)).
[18] *United States v. Sharpe*, 470 U.S. 675, 691 (1985) (quoting *United States v. Place*, 462 U.S. 696, 722 (1983) (Blackmun, J., concurring)).
[19] *United States v. Jordan*, 232 F.3d 447, 450 (5th Cir. 2000).
[20] *United States v. Sanders*, 994 F.2d 200, 206 (5th Cir.1993).

investigatory detention,[21] but "[h]andcuffing a suspect does not automatically convert an investigatory detention into an arrest requiring probable cause."[22]

At the hearing on the motion to suppress, Officer Kozlowski testified that, on June 13, 2017, he received information about suspicious activity on Dumaine Street from Sergeant Joseph Davis.[23] Officer Kozlowski and three other officers drove to the area, where they saw Muse sitting on the doorstep of a house in the 2500 block of Dumaine Street with three other people.[24] Officer Kozlowski testified,[25] and it is clear from the video footage presented at the suppression hearing, that Muse was wearing a black shirt.[26] The three people with Muse, one Black man and two Black women, were standing. Officer Kozlowski exited his vehicle, approached Muse, and handcuffed him immediately. At the same time, another officer handcuffed the other Black man.[27] The two women were not handcuffed.[28]

Officer Kozlowski testified that Muse yielded to his authority and did not flee.[29] He patted Muse down and did not find weapons or narcotics, but removed "two sets of vehicle keys from his pants belt loop."[30] Officer Kozlowski testified that, when he approached Muse, Muse was not "doing anything that looked like it was illegal."[31] The video introduced at the suppression hearing shows that Muse did not resist arrest. There is no allegation in the police report or at the testimony at trial that Muse did anything but

---

[21] *Id.*
[22] *Jordan*, 232 F.3d at 450.
[23] R. Doc. 36 at 29:14–19.
[24] R. Doc. 26-2 at 4.
[25] R. Doc. 26 at 50:1-7.
[26] Video footage from body cameras worn by the officers was introduced *in globo* as Exhibit 1. R. Doc. 36 at 6:3.
[27] *Id.* at 50:18–20.
[28] *Id.* at 50:21–22.
[29] *Id.* at 54:12–16.
[30] R. Doc. 26-2 at 4.
[31] R. Doc. 36 at 54:9–11.

cooperate fully with the officers. Officer Kozlowski testified that did not see a bulge or anything else suggesting Muse was armed.[32] Officer Kozlowski also testified he handcuffed Muse because the neighborhood was "so heavily saturated with crime, including gun violence and narcotics, which typically go hand in hand" and because he detected an odor of marijuana.[33] Officer Kozlowski did not testify that he observed Muse smoking marijuana.[34]

A reasonable person in Muse's position would understand his handcuffing, the reading of his *Miranda* rights, and the fact that he was not free to leave to be a restraint on freedom of the kind associated with a formal arrest. Based on the facts and circumstances in this case, the Court finds that Officer Kozlowski's failure to use less intrusive measures was not reasonable, and the duration, scope, and means of the detention went beyond the bounds of a *Terry* stop. The Court finds Officer Kozlowski's detention of Muse was not a *Terry* stop, but rather a warrantless arrest.[35]

The United States argues that, even though Officer Kozlowski handcuffed Muse, the detention was a *Terry* stop, not an arrest, reasoning that a *Terry* stop is "a more limited intrusion than a full-blown arrest because of the consequences of an arrest that

---

[32] *Id.* at 54: 17–18.

[33] *Id.* at 33:15–34:22.

[34] Officer Kozlowski testified at the suppression hearing that he smelled "a strong odor of marijuana" as he exited his vehicle. *Id.* at 32:4–5. He did not find marijuana on Muse. *Id.* at 52:25–53:11. The odor of marijuana is not mentioned in the police report. Even if true, the odor of marijuana on the street does not make it any more likely that a particular person on that street is armed. Officer Kozlowski's decision to handcuff Muse immediately upon approaching him is not any more reasonable as a result of his allegedly smelling marijuana.

[35] According to the video introduced at the suppression hearing, after Officer Kozlowski informed Muse of his *Miranda* rights, Officer Kozlowski told him he was "just being detained." At the suppression hearing, he testified he advised Muse he "was only purely detaining him." *Id.* at 52:6–7. In the context of determining whether suspects are in custody under *Miranda v. Arizona*, 384 U.S. 436 (1966), the Fifth Circuit has held a statement a suspect is not under arrest is not a talismanic factor" and must be analyzed "'for their effect on a reasonable person's perception and weigh[ed] against opposing facts." *United States v. Ortiz*, 781 F.3d 221, 236 (5th Cir. 2015) (internal quotations omitted) (citing *United States v. Cavazos*, 668 F.3d 190, 195 (5th Cir. 2012).

do not attend a mere Terry stop followed by release."[36] In support of this proposition, the Government quotes a Fourth Amendment treatise stating that "[a] stopping for investigation is not a lesser intrusion, as compared to arrest, because the restriction on movement is incomplete, but rather because it is brief when compared with arrest."[37] The Government fails to mention that the LaFave treatise, on which it relies, goes on to state:

> "[A] restriction of movement which is complete but yet brief, at least until probable cause for arrest develops, might still amount to an arrest rather than a *Terry* stop because attended by certain arrest-like features, but this is not inevitably the case, for it still must be determined whether the particular arrest-like measures implemented can nevertheless be reconciled with the limited nature of a *Terry*-type stop. That assessment requires a fact-specific inquiry into whether the measures used were reasonable in light of the circumstances that prompted the stop or that developed during its course."[38]

This is consistent with Supreme Court and Fifth Circuit precedent requiring courts to evaluate whether the intrusiveness of the seizure, including duration, scope, and means, were reasonable under the circumstances, which the Court has done.[39]

The United States also cites *United States v. Campbell*, in which the police approached a man who matched the description of an armed bank robber with his gun drawn, told the suspect to lie prone, and handcuffed him before searching him. [40] The court found that, because the suspect matched "the description of the armed bank robber and was walking towards the driver's side of what almost certainly had been the getaway vehicle, there were good reasons to assume that Campbell was armed."[41] As a result, the court found the officer's actions were reasonable because the suspect was likely armed,

---

[36] R. Doc. 41 at 2.
[37] *Id.*(quoting WAYNE R. LAFAVE, SEARCH & SEIZURE § 9.2(d)).
[38] LAFAVE, *supra* n.37, at § 9.2(d) (quoting *United States v. Acosta-Colon*, 157 F.3d 9 (1st Cir.1998)) (internal quotations omitted).
[39] *Sharpe*, 470 U.S. at 691; *Jordan*, 232 F.3d at 450; *Sanders,* 994 F.2d at 206.
[40] 178 F.3d 345, 347 (5th Cir. 1999).
[41] *Id.* at 349.

and held the detention did not rise to the level of an arrest. In *Campbell*, the officer's belief the suspect was armed was reasonable. In this case, Officer Kozlowski did not reasonably believe Muse was armed. Moreover, unlike in *Campbell*, in which the defendant matched the description of the suspect, Muse did not match Sergeant Davis' description because Muse was wearing a black shirt, not a white shirt, and was in the 2500 block of Dumaine Street rather than the 2600 block.

Finally, the United States cites *United States v. Jordan*, in which officers handcuffed a defendant who refused to place his hands on the hood of the car, moved his hands erratically, continuously looked over his shoulder, and walked towards the officers aggressively.[42] The *Jordan* court concluded that, given the defendant's erratic behavior, officers did not act unreasonably in handcuffing the defendant, and that the handcuffing did not exceed the scope of a *Terry* stop and rise to the level of an arrest. Unlike the defendant in *Jordan*, Muse did not resist arrest, and there is no allegation he acted erratically or was in any way uncooperative.

## II.     The officers did not have probable cause to arrest Muse.

Although "the burdens of production and persuasion generally rest upon the movant in a suppression hearing[,] . . . if a defendant produces evidence that he was arrested or subjected to a search without a warrant, the burden shifts to the government to justify the warrantless arrest or search."[43] The government must prove the constitutionality of the arrest by a preponderance of the evidence.[44]

---

[42] 232 F.3d at 450.

[43] *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977)

[44] *See United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001) ("When the government searches or seizes a defendant without a warrant, the government bears the burden of proving, by a preponderance of the evidence, that the search or seizure was constitutional.").

Because Muse's detention was a warrantless arrest, the Court must determine whether it was based on probable cause. "Probable cause for a warrantless arrest exists when the totality of facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense."[45] The existence of probable cause is determined at the moment of arrest, not in hindsight.[46] The Court considers the totality of the circumstances known to Officer Kozlowski when effectuating Muse's arrest to determine whether he had probable cause at the moment of the arrest.

A.     The Court considers the officers' collective knowledge at the time of the arrest.

The Fifth Circuit has consistently held the collective knowledge of officers in communication with each other may justify a stop or arrest.[47] Courts consider "the 'laminated total' of the information known by officers who are in communication."[48] "The collective knowledge theory for reasonable suspicion applies so long as there is 'some degree of communication' between the acting officer and the officer who has knowledge of the necessary facts."[49] It is undisputed that Officer Kozlowski and Sergeant Davis were in communication.[50] As a result, the information Sergeant Davis communicated was part of the collective knowledge on which Officer Kozlowski could rely.

---

[45] *Wadley*, 59 F.3d at 512 (citations omitted).

[46] *See Fla. v. Harris*, 568 U.S. 237, 249 ("[Courts] do not evaluate probable cause in hindsight."). Defendant's motion and the United States' opposition cite the analogous rule for reasonable suspicion. R. Doc. 26-1 at 4 (citing *United States v. Hill*, 752 F.3d 1029, 1033 (5th Cir. 2014)); R. Doc. 41 at 3 (citing *United States v. Sokolow*, 490 U.S. 1, 11 (1989)). The United States' briefing largely does not address probable cause.

[47] *See, e.g.*, *United States v. Powell*, 732 F.3d 361, 369 (5th Cir. 2013); *United States v. Ibarra*, 493 F.3d 526, 530 (5th Cir. 2007); *United States v. Kye Soo Lee*, 962 F.2d 430, 435 (5th Cir. 1992).

[48] *Kye Soo Lee*, 962 F.2d at 435.

[49] *United States v. Sanchez*, 560 F. App'x 430, 431–32 (5th Cir. 2014) (citing *Ibarra*, 493 F.3d at 530).

[50] Sergeant Davis testified he "called out [Muse's] behavior over the radio" and "instruct[ed] other officers to conduct a stop." R. Doc. 36 at 21:3–7. Officer Kozlowski testified he was "instructed by Sergeant Davis to conduct a stop." *Id*. at 37:9–11.

"The judge's role at a suppression hearing is to determine the credibility of witnesses and find the facts. At a suppression hearing, it is 'well within the trial court's discretion' to weigh the evidence and make credibility determinations regarding conflicting testimony."[51] Based on the testimony at the suppression hearing the Court makes factual findings about the officers' collective knowledge at the time of the arrest.

The Government presented evidence at the suppression hearing that the report of suspicious activity leading to Muse's arrest was supplied by Sergeant Joseph Davis via radio to the other members of the task force.[52] Officer April Augustine was assigned the responsibility of documenting the incident, including the information initially conveyed by Sergeant Davis.[53] On June 13, 2017, the day of the arrest, she prepared and signed a "Gist Sheet" in which she described the information received from Sergeant Davis as follows:

> On June 13, 2017 at or about 7:30 p.m. Sgt. Joseph Davis advised the 1st District general assignment officers of suspicious activity occurring near a blue (gray) Honda in the 2600 block of Dumaine St. Sgt. Davis advised Officer Augustine of a black male approaching the Honda[], enter the vehicle, exit the vehicle, look around the area, then close the door and walk to the 2500 block of Dumaine.[54]

Officer Augustine later prepared a narrative for the police report[55] in which she described the information the task force received from Sergeant Davis as follows:

> Officers were advised by Sgt. Joseph Davis[,] who was a surveillance unit in the area and observed a black male wearing a white undershirt, later identified as Terrell Muse, remove items from his waistband area, place the unknown items inside of a parked blue/gray Honda in the 2600 block of

---

[51] *United States v. Jones*, 187 F. Supp. 3d 714, 723 (M.D. La. 2016) (citations omitted).
[52] R. Doc. 36 at 8–15.
[53] Sergeant Davis did not prepare a Gist Sheet or a report, although he did sign Officer Augustine's Gist Sheet.
[54] R. Doc. 26-2 at 8.
[55] The date the narrative was written is not discernible from its face and was not provided by the Government.

9

Dumaine St., canvass the area suspiciously, then return to the corner in the 2500 block of Dumaine Street.[56]

At the suppression hearing on November 1, 2018,[57] Officer Augustine described the information received from Sergeant Davis as follows:

> [W]e received via radio from Sergeant Davis, who was conducting surveillance, that he observed a black male with a white wife beater on, later determined to be Mr. Terrell Muse, enter an either blue or gray Honda that was parked on Dumaine Street. It appeared that he removed something from his waistband, placed it inside the vehicle, canvassed the area to see if someone was watching, then returned to the other side of Dumaine.[58]

At the suppression hearing, Officer Nicholas Kozlowski testified that the information received from Sergeant Davis was as follows:

> We were alerted by our surveillance unit, which at the time was Sergeant Joseph Davis, of suspicious activity in the 2600 and 2500 block of Dumaine Street. He advised that the activity he observed was a male removing an unknown object from his waistband and placing it into a vehicle within the block of 2600 Dumaine.[59]

At the suppression hearing, Sergeant Davis testified that he saw a person "standing on the west side of Dumaine Street," which is the 2600 block.[60] He could "see maybe the top part of his chest and shoulders and head area."[61] He saw the man "make a motion to his waistband area with his hand."[62] He could tell the man was reaching to his waistband area because he "could see his elbow coming up as it was making a bend, like his hand was near his waistband area,"[63] but he "could not recognize what was in his hand"[64] and,

---

[56] *Id.* at 4.

[57] R. Doc. 34. The Court notes that the Fifth Circuit's "standard of review for a motion to suppress based on live testimony at a suppression hearing is to accept the trial court's factual findings unless clearly erroneous or influenced by an incorrect view of the law." *United States v. Alvarez*, 6 F.3d 287, 289 (5th Cir. 1993).

[58] R. Doc. 36 at 63:4–12.

[59] *Id.* at 29:14–19.

[60] *Id.* at 10:13–14.

[61] *Id.* at 10:22–23.

[62] *Id.* at 10:24–25.

[63] *Id.* at 11:4–6.

[64] *Id.* at 11:6–8.

in fact, could not even see what was in the man's hand.[65]   As "[he] began to make [his] turn, [he] began to get a better view of his upper torso."[66] Sergeant Davis further testified that the man "was wearing what would be a tank top style undershirt, white in color" and was "a little big darker than [himself.]"[67] He further testified the man had "a thin—what we call a chinstrap beard."[68] Sergeant Davis testified that he conveyed to the task force "his race, his complexion, [and] what he was wearing at the time," by which he meant "he was a dark-skinned black male" who was "wearing was a white shirt."[69] Sergeant Davis testified that he saw the man "open the door of a two-door Honda Accord that he was standing next to" and reach "into the Honda Accord" and that he "possibly place[d] an object inside of the Honda, and close[d] the door."[70] Sergeant Davis testified that, after appearing to place an item in the car, the man "stood near the northwest corner of Dumaine and Dorgenois exactly on the corner, and he began to look east and west on Dorgenois and north and south on Dumaine."[71] The Government asked whether the man was looking around carefully, cautiously, suspiciously and Sergeant Davis responded in the affirmative.[72] Sergeant Davis drew a map of the corner of Dorgenois Street and Dumaine Street and put a dot on the corner where the man stopped.[73] From Sergeant Davis' testimony and the drawing, it is clear Sergeant Davis saw the man in the 2600 block

---

[65] *Id.* at 11: 10–15.
[66] *Id.* at 10:21–24.
[67] *Id.* at 11:22–23.
[68] *Id.* at 11:25–12:1.
[69] *Id.* at 15:5–6, 7–9, 20–22.
[70] *Id.* at 12:4–7.
[71] *Id.* at 20:8–12.
[72] *Id.* at 20:16–19.
[73] *Id.* at 9:14–16, 24:21–23.

of Dumaine Street only.[74] The Court put the map drawn by Sergeant Davis, on which he marked the corner with a dot, into the record as Court Exhibit 1.[75]

Sergeant Davis testified that he "radioed on [the] talk channel to the members of the task force what exactly [he] observed."[76] Sergeant Davis testified that he "instruct[ed] the other task force officers to conduct a stop."[77]

The only material discrepancy between Sergeant Davis' eyewitness testimony, the Gist Sheet, the narrative in the police report, and the testimony of Officers Augustine and Kozlowski at the hearing is whether Sergeant Davis observed the man walk to the corner of the 2600 block of Dumaine Street and stop there or saw the man cross over to the 2500 block of Dumaine Street. According to the Gist sheet prepared by Officer Augustine, Sergeant Davis reported he saw a Black man enter and exit the Honda and "look around the area, then close the door and walk to the 2500 block of Dumaine."[78] According to the narrative Officer Augustine prepared for the police report, Sergeant Davis reported he saw a Black man in a white undershirt "remove items from his waistband area, place the unknown items inside of a parked blue/gray Honda in the 2600 block of Dumaine St., canvass the area suspiciously, then return to the corner in the 2500 block of Dumaine Street."[79] At the suppression hearing, she testified Sergeant Davis reported he saw a Black man "with a white wife beater on . . . enter an either blue or gray Honda that was parked on Dumaine Street[,] . . . remove[] something from his waistband, place[] it inside the

---

[74] *Id.* The Court notes that, although the streets do not exactly correspond with the cardinal directions, Dorgenois Street runs from north to south, and Dumaine Street runs from east to west. R. Doc. 34-1. The man Sergeant Davis saw actually was on the southwest corner of the intersection. In any event, the 2600 block of Dumaine Street is on the western side of the intersection. There is no dispute that the man was in the 2600 block of Dumaine Street when observed by Sergeant Davis.
[75] *Id.*
[76] R. Doc. 36 at 14:21–24.
[77] *Id.* at 21:6–7.
[78] R. Doc. 26-2 at 8.
[79] *Id.* at 4.

vehicle, canvass[] the area to see if someone was watching, then return[] to the other side of Dumaine."[80] Officer Nicholas Kozlowski did not contemporaneously prepare a Gist Sheet or a narrative for the police report but testified at the suppression hearing that Sergeant Davis reported "suspicious activity in the 2600 and 2500 block of Dumaine Street," specifically a man "removing an unknown object from his waistband and placing it into a vehicle within the block of 2600 Dumaine."[81]

The Court gives great weight to the eyewitness testimony of Sergeant Davis, who testified as to what he observed and what he communicated to the task force. Sergeant Davis testified at the suppression hearing that he saw the man in the white tank top-style shirt only in the 2600 block of Dumaine Street. After reviewing the testimony and the exhibits introduced at the suppression hearing, the Court makes a factual finding that Sergeant Davis saw a dark skinned Black man wearing a white tank top style undershirt standing by a car in the 2600 block of Dumaine Street and observed him walk to the corner of the 2600 block but did not observe him cross to the 2500 block. The Court further finds that, as a factual matter, Muse was sitting on the doorstep of a house in the 2500 block of Dumaine Street, wearing a black shirt, and visiting with three people. Muse was not doing anything that looked illegal at the time. There was no bulge in his pants or any other indication that he was armed. Officer Kozlowski put him in handcuffs immediately upon encountering him and informed him of his *Miranda* rights. Muse was compliant and offered no resistance to Officer Kozlowski's handcuffing him. All parties agree and the Court finds that, from the first moment of the encounter, Muse was not free

---

[80] R. Doc. 36 at 63:4–12. The Court notes the man would have had to cross Dorgenois Street, not Dumaine Street, to reach the 2500 block of Dumaine Street.
[81] *Id.* at 29:14–19.

to leave.[82] Officer Kozlowski did not attempt any less intrusive measures before handcuffing Muse.[83]

In addition, Officer Kozlowski's own observations before arresting Muse are part of the knowledge on which he could have and should have relied. Officer Kozlowski observed Muse wearing a black shirt, not a white shirt. [84] He observed Muse sitting on the 2500 block of Dumaine Street, not the 2600 block.[85] He observed Muse sitting with three other people[86] and Sergeant Davis saw a man standing alone.[87] Officer Kozlowski testified Muse was not "doing anything that looked like it was illegal" when he was detained.[88] He did not see a bulge or anything else suggesting Muse was armed.[89]

B. _Officer Kozlowski did not have probable cause to stop Muse based on the collective knowledge of the officers._

The Court must consider Officer Kozlowski's collective knowledge at the time of the arrest to determine whether he had probable cause to arrest Muse. Probable cause determinations are made based on the totality of the circumstances at the time of arrest.[90] "[A] search or seizure of a person must be supported by probable cause particularized with respect to that person. This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be. The Fourth and

---

[82] _Id._ at 52:8–9; 85:7–9.
[83] _Id._ at 32:4–16.
[84] _Id._ at 50:5–9.
[85] _Id._ at 42:23–43:1.
[86] _Id._ at 50:10–12.
[87] _Id._ at 10:12–14.
[88] _Id._ at 54:9–11.
[89] _Id._ at 54: 17–18.
[90] _See Wadley_, 59 F.3d at 512.

Fourteenth Amendments protect the 'legitimate expectations of privacy' of persons, not places."[91]

Sergeant Davis reported a man on the 2600 block of Dumaine Street.[92] Muse was in front of a house in the 2500 block of Dumaine Street.[93] Sergeant Davis reported a Black man in a white shirt.[94] Muse was a Black man wearing a black shirt when Officer Kozlowski arrested him. [95] Muse was not doing anything that looked illegal at the time. There was no bulge in his pants or any other indication that he was armed. He was compliant and offered no resistance to Officer Kozlowski's handcuffing him. Officer Kozlowski did not articulate any crime Muse had committed or was committing. In fact, he said he did not see Muse doing anything illegal.[96]

Officer Kozlowski's collective knowledge does not include Muse's violation of any laws relating to marijuana. Officer Kozlowski testified that he detected "a strong odor of marijuana" as he exited his vehicle.[97] The Court notes the odor of marijuana is not mentioned in the police report.[98] Even if true, the smell of marijuana on the street alone does not give police officers probable cause to arrest people standing on the street without something more connecting the smell to the particular arrested person.[99]

---

[91] *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979).
[92] R. Doc. 36 at 42:21–22.
[93] *Id.* at 42:23–43:1.
[94] *Id.* at 14:13–14.
[95] *Id.* at 50:5–9.
[96] *Id.* at 54:9–11.
[97] *Id.* at 32:4–5.
[98] R. Doc. 26-2.
[99] In its post-hearing briefing, the United States raises for the first time the argument that Officer Kozlowski had reasonable suspicion to stop Muse and probable cause to arrest Muse based on the odor of marijuana. R. Doc. 41 at 8–9. The Fifth Circuit has held consistently that the odor of marijuana provides probable cause when it emanates from a vehicle during a traffic stop, *see, e.g.*, *United States v. McSween*, 53 F.3d 684, 686–87 (5th Cir. 1995) (holding "the smell of marihuana alone may be ground enough for a finding of probable cause" to search a vehicle) (collecting cases); when there is marijuana in plain view, *see, e.g.*, *United States v. Saunders*, 476 F.2d 5, 6–7 (5th Cir. 1973); *United States v. Lopez-Ortiz*, 492 F.2d 109, 111 (5th Cir. 1974); and when it emanates from personal property, *see, e.g.*, *United States v. Jaquez*, 849 F.2d 935, 937 (5th Cir. 1988); *United States v. Garcia*, 849 F.2d 917, 919 (5th Cir. 1988). The Fifth Circuit has

Neither does Officer Kozlowski's collective knowledge include Muse's being the same man Sergeant Davis observed and described in his radio transmission to the task force. The fact that both Muse and the other Black man present were handcuffed at the same time suggests Muse did not know whether either of them was the man Sergeant Davis described.

Even if Sergeant Davis had probable cause as to the man he observed, that probable cause cannot be generalized to all people, or all people of a particular race and gender, in a given area. Sergeant Davis' probable cause to stop the man he saw in the 2600 block did not extend to justify a stop of all Black men in the vicinity.

In *United States v. Davis*, before the defendant saw the police, he was "walking at a normal pace, with his right hand holding his clothing near his waist."[100] When he saw police officers approaching him, his face "changed to a nervous or 'panicked' expression, and his hand holding the clothing near his waist 'clutched' a bit more tightly."[101] The Court noted that, "[i]n cases involving high-crime areas where the defendant grabbed or held his waistband in manner consistent with possession of a concealed firearm, courts have found reasonable suspicion when the defendant also fled upon seeing the police."[102] However, the court noted that, "[w]hen he first saw the police, [the defendant] did not begin to clutch his waist and walk quickly away from the police. Instead, [he] was already clutching his saggy pants through his oversized t-shirt while he walked, before he saw the

---

not held that merely smelling marijuana on the street provides officers with probable cause to arrest bystanders. Officer Kozlowski's smelling marijuana upon exiting his vehicle did not provide him with probable cause to effect an otherwise unconstitutional arrest. At the suppression hearing, the Government admitted that it "might be a bridge too far" for officers to handcuff a suspect "based strictly on the scent of marijuana." R. Doc. 36 at 90:1–3.

[100] No. H-08-028, 2008 WL 4372705 at *1 (S.D. Tex. Sept. 22, 2008).
[101] *Id.*
[102] *Id.* at *3 (collecting cases).

police."[103] The court found that, because the defendant did not flee, police officers did not have reasonable suspicion to stop him.[104]

Based on the totality of the circumstances at the time of the arrest, the Court finds the United States has not met its burden of providing Officer Kozlowski had probable cause to arrest Muse at the moment he handcuffed Muse.

### III. Even if the detention had been a *Terry* stop, the officers did not have reasonable suspicion to stop Muse.

During a *Terry* stop, "officers may briefly detain an individual on the street for questioning, without probable cause, when they possess reasonable, articulable suspicion of criminal activity."[105] "[I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion."[106] "Reasonable suspicion inquiries allow officers to consider 'the totality of the circumstances—the whole picture.'"[107] Police must be able to "articulate specific facts that support[] their belief that there was *something illegal* afoot . . . , even if they [can] not link those facts to a particular specific crime."[108] "[S]ome factors considered germane to a reasonable suspicion analysis include: whether the area where the stop occurred was a high crime area or one 'of expected criminal activity,' whether the individual engaged in 'unprovoked flight upon noticing the police,' and whether the individual looked nervous or made furtive gestures

---

[103] *Id.* at *4.
[104] *Id.*
[105] *United States v. Scroggins*, 599 F.3d 433, 441 (5th Cir. 2010) (citing *United States v. Michelletti*, 13 F.3d 838, 840 (5th Cir.1994) (en banc)).
[106] *Terry*, 392 U.S. at 21.
[107] *Scroggins*, 599 F.3d at 441 (quoting *United States v. Sokolow*, 490 U.S. 1, 7–8 (1989)).
[108] *United States v. Pack*, 612 F.3d 341, 356 (5th Cir.), *opinion modified on denial of reh'g*, 622 F.3d 383 (5th Cir. 2010).

or suspicious movements."[109] "[T]he burdens of production and persuasion generally rest upon the movant in a suppression hearing."[110] If the detention was a *Terry* stop, Muse bears the burden of proving Officer Kozlowski did not have a reasonable suspicion of criminal activity.

Even if Officer Kozlowski's stop of Muse was a detention rather than an arrest, he did not have reasonable suspicion to believe that Muse was engaging in criminal activity. When Officer Kozlowski stopped Muse, he knew only that Muse was a Black man wearing a black shirt in the 2500 block of Dumaine Street, a high-crime neighborhood, and that a Black man in a white shirt may have removed an item from his waistband and placed it into a car in the next block.[111] Even if the person observed by Sergeant Davis could have been stopped, Officer Kozlowski had little or no reason to believe Muse was that person. Muse was dressed differently and was in a different location. He was not "doing anything that looked like it was illegal," and Officer Kozlowski did not observe a bulge or anything else suggesting Muse was armed.[112] Reasonable suspicion, like probable cause, cannot be generalized to all people, or all people of a particular race and gender, in a given area. Muse has met his burden of proof of showing that Officer Kozlowski did not have reasonable suspicion to stop Muse.

---

[109] *United States v. Tuggle*, 284 F. App'x 218, 223 (5th Cir. 2008) (citing *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000); *United States v. Watson*, 953 F.2d 895, 897 (5th Cir.1992)).
[110] *De la Fuente*, 548 F.2d at 533.
[111] R. Doc. 36 at 14:21–24.
[112] *Id.* at 54:9–11, 17–18.

## IV. Evidence derived from the discovery of the car keys on Mr. Muse's person must be suppressed

At the same time as the interaction with Muse, Officer Augustine and her partner searched the Honda parked on the 2600 block of Dumaine Street, which was unlocked with its engine running.[113] They found two firearms and substances that later tested positive for cocaine base and heroin.[114] Officer Augustine used the keys taken off Muse's belt loop to confirm that one set of keys corresponded to the Honda.[115] Only then did Sergeant Davis arrive on the scene and identify Muse as the man he had observed behaving suspiciously.[116]

"Under the fruit-of-the-poisonous tree doctrine, 'all evidence derived from the exploitation of an illegal search or seizure must be suppressed, unless the Government shows that there was a break in the chain of events sufficient to refute the inference that the evidence was a product of a Fourth Amendment violation.'"[117] "[E]vidence should not be excluded merely because it would not have been discovered "but-for" a constitutional violation. 'Rather, the more apt question in such a case is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'"[118]

In the instant case, the police officers discovered the Honda keys on Muse's person during the search following an unconstitutional arrest. Their discovery of the keys directly

---

[113] *Id.*
[114] *Id.*
[115] *Id.* This timeline is confirmed by the videos entitled "Augustine1" and "Kozlowski1" introduced at the suppression hearing. Ex. 1.
[116] *Id.*
[117] *United States v. Martinez*, 486 F.3d 855, 864 (5th Cir. 2007) (quoting *United States v. Rivas*, 157 F.3d 364, 368 (5th Cir.1998)).
[118] *United States v. Hernandez*, 670 F.3d 616, 620 (5th Cir. 2012) (quoting *United States v. Wong Sun*, 371 U.S. 471, 487–88 (1963)).

resulted from the unconstitutional arrest. The seizure of the keys was illegal, and all evidence come by through the exploitation of that illegality, is therefore tainted and must be suppressed.

The United States argues the firearms and drugs in the Honda were discovered separately. The Honda was left with its engine running, in violation of Louisiana law.[119] The United States argues that only after the officers found the firearms and controlled substances did the officers link the contraband to Muse.[120] However, the videos introduced at the suppression hearing show Officer Kozlowski took the car keys from Muse's belt loop before the car was searched, and Officer Augustine used the keys to link the Honda to Muse.[121] The videos also show the officers who searched the car were in communication with the officers making the arrest.[122] The officers were part of one investigation. Although the officers who arrested Muse were not the same as the ones who searched the car, the illegal stop, the seizure of the car keys, and the seizure of the drugs and guns in the car are not sufficiently distinguishable for the drugs and guns to be purged of the primary taint. As a result, all evidence seized from Muse's person and from the Honda must be suppressed.

---

[119] La. Rev. Stat. § 32:145 ("No person driving or in charge of any motor vehicle shall permit it to stand unattended without first stopping the motor, locking the ignition, removing the key, and effectively setting the brake thereon.").

[120] *Id.*

[121] The video entitled "Kozlowski1" shows Officer Kozlowski took the keys from Muse's belt look around timestamp 29:27. The video entitled "Cooper1" shows the officers who searched the car did not approach the car until around 29:48. Ex. 1. The United States represents "the timestamps on the body camera videos are synched." R. Doc. 41 at 12 n.4.

[122] The video entitled "Cooper1" shows radio communication between officers who searched the car and the officers standing close to Muse. Ex. 1.

## CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that Defendant Terrell Muse's motion to suppress all evidence resulting from Muse's arrest and the search of the Honda be and hereby is **GRANTED**.[123]

**New Orleans, Louisiana, this 12th day of December, 2018.**

*Susie Morgan*
**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**

---

[123] R. Doc. 26.